## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COUMBIA

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION,<br>1040 Spring Street, Silver Spring, Maryland<br>20910 | ) ) ) | C.A. No._____ |
| Plaintiff, | ) ) | |
| v. | ) ) | COMPLAINT<br>JURY TRIAL DEMANDED |
| VANDERBILT UNIVERSITY, 305 Kirkland<br>Hall, Vanderbilt University, Nashville,<br>Tennessee 37240 and | ) ) ) ) | |
| DR. JAMES E. LOYD, 4111 Sneed Rd.,<br>Nashville, Tennessee 37215 | ) ) | |
| Defendants. | | |

## COMPLAINT AND JURY DEMAND

Plaintiff United Therapeutics Corporation ("UTC"), by its undersigned attorneys, for its

Complaint against Defendants Vanderbilt University ("Vanderbilt") and Dr. James E. Loyd

("Loyd"), alleges as follows:

## NATURE OF THE ACTION

1.     This action arises from Vanderbilt's breach of the Research Grant Agreement by and

between UTC and Vanderbilt, dated May 5, 1998 ("the Agreement") (attached as Exhibit A hereto).

The Agreement sets forth the rights and obligations of the parties, UTC, Vanderbilt, and Loyd as an

employee and an agent of Vanderbilt, regarding certain research to be undertaken in connection with

UTC's development of a new drug to assist patients suffering from a potentially fatal pulmonary

vascular disease, pulmonary hypertension.  Consistent with that purpose, the Agreement granted

UTC all right and title to the U.S. patents resulting from the work performed under the Agreement.

The research resulted in U.S. Patent Nos. 6,521,212 (the "'212 patent") (attached as Exhibit B hereto) and 6,756,033 (the "'033 patent") (attached as Exhibit C hereto) (collectively the "Patents"). In 2009, UTC obtained FDA approval to market and sell a drug called TYVASO® (treprostinil) Inhalation Solution that has now been improving patients' lives for seven years.  The Patents cover TYVASO® (treprostinil) Inhalation Solution and are listed, along with other patents, in Food and Drug Administration's ("FDA's") *Approved Drug Products with Therapeutic Equivalence Evaluations* publication, commonly referred to as the Orange Book.

2.      The Patents are now being challenged by a third party company that wants to make and sell a generic copy of TYVASO®.  The Agreement requires Vanderbilt—and Loyd as Vanderbilt's agent—to cooperate with UTC in defending and asserting the Patents in the litigation. However, despite that obligation, Vanderbilt and Loyd have consistently refused to cooperate with UTC and have actively thwarted UTC's efforts to develop UTC's defense of the Patents.  Rather, upon information and belief, Vanderbilt and Loyd are seeking to undermine UTC's position in an effort to extract additional monies beyond those that UTC and Vanderbilt negotiated and that UTC already paid under the terms of the Agreement.

3.      It is undisputed that the Patents at issue—whose inventors include Loyd and certain other individuals, including several individuals associated with UTC—are currently assigned to UTC.  Before the Patents issued, UTC obtained a valid and enforceable assignment (the "Assignment") by and between UTC and each of the inventors, including Loyd, dated June 3, 1999 (attached as Exhibit D hereto).  Through the Assignment, Loyd, who was an employee and agent of Vanderbilt, and all the other inventors represented and warranted that they had valid title to the Patents.  As the title implies, the Assignment transferred and assigned all rights, title, and interest in and to the Patents to UTC.

4.      In communications with UTC, counsel for Vanderbilt and Loyd has recently taken the position that Vanderbilt and/or Loyd has an ownership interest in the Patents.  That stance is inconsistent with the facts and the law.  UTC has exclusive rights and title to the Patents as a result of the Assignment from the inventors, including Loyd, who was an employee and agent of Vanderbilt at the time he signed the Assignment.  By executing it, Loyd bound himself and Vanderbilt to the terms of the Assignment.

5.      UTC seeks a declaratory judgment that, as a result of the Agreement and/or Assignment, Loyd and Vanderbilt have no rights, title, or interest in the Patents, and that UTC is the rightful exclusive owner by assignment of all the rights, titles, and interests in the Patents that Loyd and/or Vanderbilt might have otherwise had.

6.      In addition to a declaration of UTC's ownership of the Patents, UTC seeks damages as a result of Vanderbilt's and Loyd's conduct.  Vanderbilt and Loyd are breaching the terms of the Agreement and the Assignment by asserting some ownership interest in the Patents, and by failing to cooperate with UTC in connection with UTC's defense of the Patents.  Vanderbilt and Loyd are also breaching the duty of good faith and fair dealing by their conduct.  In addition and in the alternative, to the extent Vanderbilt or Loyd maintain any ownership rights, Vanderbilt and Loyd have engaged in fraud by making various representations in the Agreement and Assignment, including the representation that UTC is the valid owner of all rights, title, and interest in the Patents and that Loyd assigned any rights he may have had in the Patents to UTC.  Loyd is also tortiously interfering in the Agreement and the Assignment by taking the position that either Vanderbilt or Loyd has an ownership interest in the Patents.

### THE PARTIES

7.      Plaintiff UTC is a corporation organized and existing under the laws of the State of Delaware, and having a place of business at 1040 Spring Street, Silver Spring, Maryland.  Plaintiff UTC also maintains an office in this District at 1735 Connecticut Ave, N.W., Washington, D.C.

8.      Upon information and belief, Defendant Vanderbilt is a non-profit corporation organized and existing under the laws of the State of Tennessee, and having a principal place of business at 305 Kirkland Hall, Vanderbilt University, Nashville, Tennessee 37240.

9.      Upon information and belief, Defendant Loyd is a person whose domicile is located in Tennessee at 4111 Sneed Rd., Nashville, TN 37215-2303, and who is employed by Vanderbilt.

### JURISDICTION AND VENUE

10.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

11.      This Court has personal jurisdiction over Vanderbilt and Loyd pursuant to D.C. Code Ann. § 13-423, because this action specifically arises out of business conducted by Vanderbilt and Loyd in Washington, D.C.  Specifically, Vanderbilt and Loyd negotiated the Agreement and Assignment in Washington, D.C., which give rise to the claims and allegations set forth herein. Vanderbilt and Loyd are also engaging in improper and tortious conduct causing injury in this District.  Upon information and belief, Vanderbilt has maintained and continues to maintain continuous and systematic contacts with Washington, D.C.

12.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391.  UTC was headquartered in this District at the time of the execution of the Agreement and the Assignment and a substantial part of the events or omissions giving rise to the claims occurred in this District.  The

-4-

Agreement and Assignment were negotiated from within this District, communications related to the performance of the Agreement and Assignment took place in this District, and communications regarding the dispute over the Agreement and Assignment originated from within this District. Vanderbilt and Loyd are also engaging in improper and tortious conduct causing injury in this District.

## FACTUAL ALLEGATIONS

13.     UTC is a biotechnology and pharmaceutical company founded in 1996 to discover and develop new treatments for pulmonary hypertension ("PH"). PH is a rare and often fatal condition characterized by a severe blood pressure increase in the pulmonary arteries located between the heart and lungs. At the time of UTC's incorporation, there were no drugs on the market approved by FDA for the treatment of PH and relatively little money available for PH drug development. UTC began research and development of a licensed drug candidate, treprostinil, to treat PH. UTC's research efforts were successful and UTC eventually obtained FDA approval to sell treprostinil for infusion through a continuous pump.

14.     In addition to delivering treprostinil through a pump, UTC also investigated alternative methods of delivering treprostinil to patients. In early 1997, UTC approached Vanderbilt to discuss the feasibility of using UTC's treprostinil (known as "15AU81" or "UT-15") to develop an aerosolized inhalable drug product to treat PH.

15.     On March 11, 1997, pursuant to Vanderbilt's and UTC's previous discussions, Loyd and Dr. Richard Parker ("Parker"), also employed by Vanderbilt, sent a proposal to UTC for UTC to finance pilot studies in sheep using inhaled UT-15 (the "Proposal").

16.     In late 1997, during the course of the pilot sheep studies, Vanderbilt and UTC began

negotiating an agreement that would cover the research concurrently being conducted by UTC and

Vanderbilt pursuant to the Proposal, as well as any intellectual property rights resulting therefrom.

17.     In May 1998, the negotiations culminated in execution of the Agreement. *See* Ex. A.

The Agreement provided that UTC would be responsible for the payment of all expenses necessary

to carry out the UT-15 drug discovery research conducted pursuant to the Proposal, and bear full

responsibility to obtain any regulatory approval and patent protection for any inventions resulting

from such research, in exchange for ownership of any and all resulting intellectual property rights.

*Id.* at ¶¶ 1, 3, 5. Following execution of the agreement, Vanderbilt and UTC researchers worked

hand-in-hand to complete the research contemplated by the Agreement.

18.     On March 18, 1999, UTC filed United States Provisional Patent Application No.

60/124,999 (the "'999 application") (attached as Exhibit E hereto), which covered methods of

treating PH using aerosolized UT-15. The '999 application named researchers at UTC as well as

Parker and Loyd as co-inventors. During the pendency of the '999 application, Loyd and Vanderbilt

never asserted that Loyd was the sole inventor of any claims in the '999 application. Instead, Loyd,

on his behalf and as agent for Vanderbilt, represented that he was a "co-inventor" of the claims in

that application. Pursuant to the terms of the Agreement and consistent with Loyd's representation

of his role as a "co-inventor," Loyd executed the Assignment on his own behalf and as an agent of

Vanderbilt, assigning to UTC the '999 application and "all divisional, renewal, substitute,

continuation and Convention applications based in whole or in part upon said inventions or upon

said applications." Ex. D at 4. Loyd, on his own behalf and as an agent of Vanderbilt, covenanted

that the rights assigned to UTC were "not encumbered by any grant, license or other right." *Id.* The

Assignment was recorded at the United States Patent and Trademark Office on May 4, 1999, and

thereafter available to the public for inspection.  Neither Loyd nor Vanderbilt ever challenged the execution or recording of the Assignment.

19.     In 2000 and 2002, UTC filed the patent applications that subsequently issued as the '212 patent and the '033 patent, respectively.  Each covered methods of treating PH using aerosolized UT-15 and claimed priority to the '999 application.  Accordingly, pursuant to the terms of the Agreement and the Assignment, UTC was rightfully listed as the lawful owner by assignment of the '212 and '033 patents.  Between the filing of those applications and the current dispute, neither Loyd nor Vanderbilt challenged UTC's ownership of the Patents.

20.     The Patents issued in February 2003 (the '212 patent) and June 2004 (the '033 patent), and UTC is listed on the face of each of the Patents as the assignee.  Between the issuance of the Patents and the current dispute, neither Loyd nor Vanderbilt challenged UTC's ownership of the Patents.

21.     In 2008, following years of additional research and studies performed by UTC, UTC submitted a New Drug Application ("NDA") No. 022-387 for an inhalable treprostinil product called TYVASO® (treprostinil) Inhalation Solution, and FDA approved the application in 2009.  Because the FDA-approved use of TYVASO® is covered by one or more claims of each of the Patents, the Patents were listed in connection with TYVASO® in the FDA's *Approved Drug Products with Therapeutic Equivalents* publication (also known as the "Orange Book").  Between the filing of the NDA and the current dispute, neither Loyd nor Vanderbilt challenged UTC's ownership of the Patents or their listing in the Orange Book.

22.     On July 22, 2015, UTC sued Watson Laboratories, Inc. ("Watson") for infringement of, *inter alia*, the '212 and '033 patents based on Watson's efforts to market a generic copy of TYVASO®. *See United Therapeutics Corp. v. Watson Labs. Inc.*, Case No. 3:15-cv-05723-PGS-

LHG (D.N.J.) (the "Watson Litigation"). In its defense in the Watson Litigation, Watson alleged that the Patents are invalid. As of the filing of this complaint, the case remains pending.

23.     On January 13, 2016, the same day the Pretrial Scheduling Order was entered in the Watson Litigation (Dkt. No. 35), counsel for UTC contacted Loyd in order to alert him and Vanderbilt to the Watson Litigation and to begin working with him to develop the facts surrounding the invention in order to defend against Watson's invalidity defense.

24.     As of the date of this complaint, Loyd has never responded to counsel's initial communication or multiple further attempts at communication. Instead, in-house counsel for Vanderbilt intervened and began a months-long series of calls and correspondence with counsel for UTC.

25.     During these communications, in-house counsel for Vanderbilt initially noted it could not locate documentation regarding the transfer of ownership rights from the Vanderbilt inventors to UTC for the Patents. In response, UTC provided Vanderbilt copies of the executed Agreement and Assignment. Thereafter, Vanderbilt requested that counsel for UTC set up a call with outside counsel for Vanderbilt to discuss the Agreement and the Patents.

26.     On April 5, 2016, pursuant to Vanderbilt's request, counsel for UTC engaged in a teleconference with both in-house and outside counsel for Vanderbilt. During this call, Vanderbilt for the first time asserted that: (1) in recent discussions with Loyd – notwithstanding his prior representation that he was a "co-inventor" – Loyd believed he was the *sole* inventor of some claims of the Patents; (2) Loyd believed he invented these claims prior to the Agreement; and (3) in Vanderbilt's opinion, the Agreement did not grant UTC rights to any inventions made before the Agreement. Counsel for UTC expressed surprise that Vanderbilt and Loyd appeared to be suggesting that Vanderbilt and/or Loyd had some sort of ownership interest in the Patents for the

first time over seventeen years after the Agreement had been executed, about twelve years after the Patents had issued, and over six years after TYVASO® had been approved by FDA. Counsel for UTC further noted: (a) that the Agreement and the Assignment clearly establish UTC's ownership of the Patents; and (b) that, consistent with the Agreement, UTC simply wanted to work with Loyd and Vanderbilt to develop a strategy to defend the Patents against Watson's claims of invalidity.

27.     Counsel for UTC and Vanderbilt subsequently engaged in a number of additional teleconferences following the April 5, 2016 call. Despite the plain language of both the Agreement and the Assignment granting UTC all right, title, and interest in and to the Patents, Vanderbilt reiterated its previous assertions and further asserted that Loyd's employment agreement with Vanderbilt required him to assign all his inventions to Vanderbilt, and accordingly, the Assignment of the Patents from Loyd to UTC was invalid. To date, despite requests from UTC, Vanderbilt has not provided UTC with a copy of Loyd's employment agreement or the allegedly relevant portions of any such agreement. Vanderbilt further asserted that it would not allow or facilitate communication between UTC and Loyd until UTC addressed Vanderbilt's concerns.

28.     Pursuant to Vanderbilt's Intellectual Property Policy, if Vanderbilt does have some ownership interest in the Patents and is owed some form of royalty or other payment, Loyd would be entitled to a portion of those monies.

29.     Counsel for UTC again addressed Vanderbilt's allegations and also notified Vanderbilt that it was in breach of at least paragraph 5(b) of the Agreement, which requires Vanderbilt, upon receipt of notice of any claim, suit, or cause of action asserting invalidity of any patent covered by the Agreement, to consult with UTC to "develop a strategy to respond." Counsel for UTC also notified Vanderbilt that: (1) paragraph 10(a) of the Agreement requires Vanderbilt to indemnify UTC for any and all losses resulting from or arising out of any misconduct by Vanderbilt

in the performance of its obligations under the Agreement; (2) UTC believed Vanderbilt was engaging in such misconduct by interfering with UTC's defense of the Patents, by suddenly claiming an ownership interest in the Patents to which Vanderbilt and Loyd have no rights, and by thwarting communications between UTC and Loyd to defend Watson's allegations of invalidity of the Patents in the Watson Litigation; and (3) should Vanderbilt continue to prevent UTC from developing its case in the Watson Litigation, UTC would seek such indemnification for all damages it suffers as contemplated in paragraph 10(a) of the Agreement.

30.     Representatives from Vanderbilt and UTC have since sought to negotiate this dispute, including during an in-person meeting in Washington, D.C. on July 11, 2016.  However, these negotiations have proved fruitless.

31.     As of the filing of this complaint, Vanderbilt has continued to refuse to assist UTC in developing its case in the Watson Litigation and continues to contest UTC's exclusive ownership of the Patents.

## COUNT 1
### (Breach of Contract)
### (Against Vanderbilt and Loyd)

32.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

33.     UTC and Vanderbilt, as signatories, entered into the Agreement on May 5, 1998.

34.     The Agreement required Vanderbilt to, in part:

a.   Collaborate and cooperate in a drug discovery effort to identify and develop various methods of delivery for UT-15 pursuant to the Proposal;

b.   Assign any and all rights, title and interest in and to all inventions developed under the Agreement, including any U.S. patents, to UTC;

    c.   Upon notice of any pending claim, suit, or cause of action alleging that any patent granted to UTC by the Agreement is invalid, consult with UTC to develop a strategy to respond to the pending claim, suit, or cause of action; and

    d.   Indemnify, defend, and hold UTC harmless from any and all losses resulting from or arising out of the negligence or willful misconduct of Vanderbilt in the performance of its obligations under the Agreement.

35.     UTC performed its responsibilities under the Agreement by: providing and bearing costs of all expenses necessary to carry out the research pursuant to the Proposal; obtaining intellectual property protection for inventions resulting from such research, including the Patents; obtaining regulatory approval for TYVASO®; and notifying Vanderbilt of Watson's pending claim of invalidity of the Patents.

36.     Vanderbilt, and Loyd as Vanderbilt's agent, breached the Agreement by, *inter alia*, claiming an ownership interest in the Patents and failing to comply with the obligations under the Agreement with respect to consulting with UTC to develop a strategy to respond to the pending claim by Watson that the Patents are invalid, and refusing to facilitate communications between counsel for UTC and Loyd to formulate UTC's litigation strategy in the Watson Litigation.

37.     As a result of the breach of the Agreement, UTC has suffered and will continue to suffer damage including but not limited to damage to its ability to prosecute its claims and defenses in the Watson Litigation.

**COUNT 2**
**(Breach of Contract)**
**(Against Vanderbilt and Loyd)**

38.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

39.    At all relevant times, Loyd was acting as the agent on behalf of Vanderbilt for purposes of complying with the Agreement and for purposes of executing and complying with the Assignment.

40.    Loyd executed the Assignment as the agent for Vanderbilt.

41.    Under the Assignment Loyd, as the agent for Vanderbilt, in relevant part:

a.    Assigned to UTC all right, title and interest in and to the '999 application and any and all patents based in whole or in part upon the '999 application, including the Patents;

b.    Covenanted that the assigned rights were not encumbered by any grant, license or other right previously given; and

c.    Covenanted to do all acts reasonably serving to ensure that the assigned patents are held and enjoyed fully and entirely by UTC, including but not limited to furnishing to UTC all facts and documents relating to the inventions of the assigned patents upon request.

42.    Vanderbilt and Loyd as the agent on behalf of Vanderbilt breached the Assignment by, *inter alia*: taking the position that the Assignment did not assign to UTC all right, title, and interest in and to the '999 application and any patents based on it; by falsely covenanting that all right, title, and interest in and to the '999 application and any patents based on it were not unencumbered by any grant, license, or other right previously given; and by failing to comply with the obligations under the Assignment with respect to performing all acts to ensure that the Patents are enjoyed fully, exclusively, and entirely by UTC, including but not limited to furnishing to UTC all facts relating to the invention of the Patents upon UTC's request.

43.    As a result of the breach of contract by Vanderbilt and Loyd as Vanderbilt's agent, UTC has suffered damage.

-12-

## COUNT 3
### (Breach of Contract)
### (Against Loyd)

44.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

45.     Loyd, as signatory, executed a valid Assignment to UTC on June 3, 1999.  To the degree Loyd did so as agent for Vanderbilt, UTC asserts a claim for breach of contract against Vanderbilt and Loyd as described in Count 2, above.  In the alternative, to the degree Loyd did so on his own behalf and not as the agent for Vanderbilt, UTC asserts a claim under this Count 3 against Loyd for breach of contract against him individually.

46.     Under the Assignment Loyd, in relevant part:

   a.   Assigned to UTC all right, title, and interest in and to the '999 application and any and all patents based in whole or in part upon the '999 application, including the Patents;

   b.   Covenanted that the assigned rights were not encumbered by any grant, license, or other right previously given; and

   c.   Covenanted to do all acts reasonably serving to ensure that the assigned patents are held and enjoyed fully and entirely by UTC, including but not limited to furnishing to UTC all facts and documents relating to the inventions of the assigned patents upon request.

47.     Loyd breached the Assignment by, *inter alia*: taking the position that the Assignment did not assign to UTC all right, title, and interest in and to the '999 application and any patents based on it; by falsely covenanting that all right, title, and interest in and to the '999 application and any patents based on it were not unencumbered by any grant, license, or other right previously given; and

by failing to comply with the obligations under the Assignment with respect to performing all acts to ensure that the Patents are enjoyed fully and entirely by UTC, including but not limited to furnishing to UTC all facts relating to the invention of the Patents upon UTC's request.

48.     As a result of Loyd's breach of contract, UTC has suffered damage.

## COUNT 4
### (Breach of Covenant of Good Faith and Fair Dealing)
### (Against Vanderbilt and Loyd)

49.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

50.     UTC and Vanderbilt, as signatories, entered into the Agreement on May 5, 1998.

51.     At all relevant times, Loyd was acting as the agent on behalf of Vanderbilt for purposes of complying with the Agreement and for purposes of executing and complying with the Assignment.

52.     Loyd executed the Assignment as the agent for Vanderbilt.

53.     The Agreement and the Assignment include an implied covenant of good faith and fair dealing.  The covenant of good faith and fair dealing requires that parties to a contract exercise good faith and diligence in the performance of their duties and that no party engage in any conduct to deprive any other party of the enjoyment of its rights and benefits under the contract.

54.     Vanderbilt, and Loyd as Vanderbilt's agent, breached the covenant of good faith and fair dealing by engaging in the conduct described in this complaint, including but not limited to: refusing to consult with UTC to develop a strategy to respond to the pending claim by Watson that the Patents are invalid; improperly maintaining an erroneous claim of ownership to some portion of the Patents; and directly contesting the ownership of UTC's intellectual property rights.  Vanderbilt

-14-

has also refused to facilitate communications between counsel for UTC and Loyd to formulate UTC's litigation strategy in the Watson Litigation.

55.     Upon information and belief, this conduct was intended to deprive UTC of the benefits of the Agreement.

56.     Upon information and belief, this conduct was further intended to enrich Vanderbilt and Loyd as Vanderbilt's agent to the detriment of UTC.

57.     As a result of the breach of the covenant of good faith and fair dealing, UTC has suffered damage.

### Count 5
### (Breach of Covenant of Good Faith and Fair Dealing)
### (Against Loyd)

53.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

54.     Loyd, as signatory, executed a valid Assignment to UTC on June 3, 1999.  To the degree Loyd did so as agent for Vanderbilt, UTC asserts a claim for breach of the covenant of good faith and fair dealing against Vanderbilt and Loyd as described in Count 4, above.  To the degree Loyd did so on his own behalf and not as the agent for Vanderbilt, UTC asserts a claim under this Count 5 against Loyd for breach of the covenant of good faith and fair dealing against him individually.

55.     The Assignment includes an implied covenant of good faith and fair dealing.  The covenant of good faith and fair dealing requires that parties to a contract exercise good faith and diligence in the performance of their duties and that no party engage in any conduct to deprive any other party of the enjoyment of its rights and benefits under the contract.

56.     Loyd breached his covenant of good faith and fair dealing by engaging in the conduct described in this complaint, including, but not limited to: refusing to consult with UTC to develop a strategy to respond to the pending claim by Watson that the Patents are invalid; improperly maintaining an erroneous claim of ownership to some portion of the Patents; and directly contesting the ownership of UTC's intellectual property rights.

57.     Upon information and belief, Loyd's conduct was intended to deprive UTC of the benefits of the Assignment, including, but not limited to, UTC's full and complete exclusive ownership of the Patents and UTC's ability to maintain and prosecute its claims and defenses in the Watson Litigation.

58.     Upon information and belief, Loyd's conduct was further intended to enrich Loyd to the detriment of UTC because under Vanderbilt's Intellectual Property Policy Loyd would be entitled to a portion of any monies that Vanderbilt obtains from UTC.

59.     As a result of Loyd's breach of the covenant of good faith and fair dealing, UTC has suffered damage.

## COUNT 6
### (Tortious Interference with Contractual Relations)
### (Against Loyd)
### (In the Alternative)

60.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

61.     UTC asserts this claim only in the alternative that (a) Loyd was to some degree not an agent on behalf of Vanderbilt when engaged in the acts identified in the Complaint; (b) Loyd to some degree was not acting within the scope of his agency when engaged in the acts identified in the Complaint; and/or (c) Loyd acted in bad faith when engaged in the acts identified in the Complaint.

62.     UTC and Vanderbilt are parties to the Agreement.

63.     Loyd in his individual capacity is not a party to the Agreement.

64.     The Agreement is valid and legally binding.

65.     On information and belief, in recent communications Loyd deliberately misstated the facts regarding the invention disclosed in the Patents.  For example, although UTC and Loyd jointly conceived of the invention of using inhaled UT-15 to treat PH and Loyd represented that he was a "co-inventor" of the resulting patent claims, Loyd recently stated that that he believed he was the sole inventor of certain of those claims.

66.     On information and belief, Loyd was aware of the Agreement and Assignment when he deliberately misstated the facts regarding the conception of the invention disclosed in the Patents.

67.     On information and belief, Loyd knowingly induced Vanderbilt to breach its obligations as described in this complaint.  Loyd's acts constitute tortious interference with UTC's existing contractual relations.

68.     On information and belief, Loyd intentionally aided, abetted, assisted, and caused Vanderbilt to breach the Agreement as described in this complaint for the purpose of damaging UTC's exclusive rights to Patents and for the economic benefit of Loyd.

69.     On information and belief, Loyd's actions as alleged herein were done with malice and specific intent to disrupt UTC's contractual relations.

70.     Loyd has directly harmed UTC's full and complete exclusive ownership of the Patents and UTC's ability to defend against Watson's claims of invalidity of the Patents.

71.     UTC is currently suffering and will continue to suffer actual economic damages as a result of Loyd's tortious conduct, including but not limited to harming UTC's full and complete

exclusive ownership of the Patents and damaging UTC's ability to maintain and prosecute its claims

and defenses in the Watson Litigation.

**Count 7**
**(Fraud)**
**(Against Vanderbilt and Loyd)**
**(In the Alternative)**

72.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth

herein.

73.     UTC and Vanderbilt, as signatories, entered into the Agreement on May 5, 1998.

74.     At all relevant times, Loyd was acting as the agent on behalf of Vanderbilt for

purposes of complying with the Agreement and for purposes of executing and complying with the

Assignment.

75.     Loyd executed the Assignment as the agent for Vanderbilt on June 3, 1999.

76.     In the Agreement, Vanderbilt represented that any and all rights, title, and interest in

and to all inventions developed under the Agreement, including any U.S. patents, were assigned to

UTC.  In the Assignment, Loyd as agent for Vanderbilt represented, *inter alia*, that UTC was

assigned all right, title, and interest in and to the '999 application and any and all patents based in

whole or in part upon the '999 application, including the Patents, and that the assigned rights were

not encumbered by any grant, license, or other right previously given.

77.     To the extent Vanderbilt or Loyd are found to have maintained any rights, title, or

interest in the Patents, the representations in the Agreement and Assignment were false.

78.     The representations were material facts in connection with UTC's ownership of the

Patents, and UTC's efforts to develop, market, and sell its drug TYVASO®.

-18-

79.     On information and belief, the representations in the Agreement and Assignment were made with knowledge of their falsity.

80.     On information and belief, the representations were made with the intent to deceive UTC.

81.     UTC reasonably relied on the representations in the Agreement and Assignment for the past sixteen years, including but not limited to bearing complete and sole responsibility for the prosecution and maintenance of the Patents, the filing and maintenance of the NDA covering TYVASO®, and the prosecution and maintenance of the Watson Litigation.

82.     UTC is currently suffering, and will continue to suffer actual economic damages as a result of reliance on the misrepresentations.

**Count 8**
**(Fraud)**
**(Against Loyd)**
**(In the Alternative)**

83.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

84.     Loyd executed the Assignment on June 3, 1999.  To the degree Loyd did so as agent for Vanderbilt, UTC asserts a claim for fraud as described in Count 7, above.  To the degree Loyd did so on his own behalf and not as the agent for Vanderbilt, UTC asserts a claim under this Count 8 against Loyd for fraud against him individually.

85.     In the Assignment, Loyd represented, *inter alia*, that UTC was assigned all right, title, and interest in and to the '999 application and any and all patents based in whole or in part upon the '999 application, including the Patents, and that the assigned rights were not encumbered by any grant, license, or other right previously given.

86.     To the extent Vanderbilt or Loyd are found to have maintained any rights, title, or interest in the Patents, the representations in the Assignment were false.

87.     The representations were material facts in connection with UTC's ownership of the Patents, and UTC's efforts to develop, market, and sell its drug TYVASO®.

88.     On information and belief, the representations in the Assignment were made with knowledge of their falsity.

89.     On information and belief, the representations were made with the intent to deceive UTC.

90.     UTC reasonably relied on the representations in the Assignment for the past sixteen years, including but not limited to bearing complete and sole responsibility for the prosecution and maintenance of the Patents, the filing and maintenance of the NDA covering TYVASO®, and the prosecution and maintenance of the Watson Litigation.

91.     UTC is currently suffering, and will continue to suffer actual economic damages as a result of reliance on the misrepresentations.

### Count 9
### (Declaratory Judgment of UTC's Ownership of the '212 and '033 Patents)
### (Pursuant to 28 U.S.C. § 2201)
### (Against Vanderbilt and Loyd)

92.     UTC repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

93.     UTC and Vanderbilt, as signatories, entered into a valid Research Grant Agreement on May 5, 1998.  Loyd, as signatory, executed a valid Assignment to UTC on June 3, 1999.

94.     UTC was assigned any and all rights, title, and interest in and to all inventions developed under the Agreement, including any U.S. patents.

95.    The inventions claimed by the Patents were developed under the Agreement.

96.    On March 18, 1999, Loyd on his own behalf and as agent for Vanderbilt executed the Assignment, which assigned to UTC all rights, title, and interest in the '999 application and "all divisional, renewal, substitute, continuation and Convention applications based in whole or in part upon said inventions or upon said applications," including, but not limited to, the Patents.

97.    As a result of the Agreement and/or the Assignment, UTC is the rightful owner of all rights to the Patents.

98.    Vanderbilt and Loyd deny that UTC is the rightful owner of all rights to the Patents.

99.    There exists an actual, immediate, real, and substantial controversy between the parties having adverse legal interests regarding whether either the Agreement or the Assignment or both validly assigned to UTC all rights, title, and interest to the invention disclosed in the '999 application and all divisional, renewal, substitute, continuation and Convention applications based in whole or in part upon said inventions or upon the '999 application, including, but not limited to the Patents.

100.    For the reasons set forth above, UTC is entitled to a declaratory judgment that:

a.    The Agreement, the Assignment, or both together granted to UTC all rights, title, and interest to the Patents;

b.    Vanderbilt and Loyd are not entitled to any payments or transfers of rights from UTC with respect to the invention disclosed in the '999 application and all divisional, renewal, substitute, continuation, and Convention applications based in whole or in part upon said inventions or upon the '999 application, including, but not limited to the Patents.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

A.    A judgment that Vanderbilt has breached the Agreement;

B.    A judgment that Vanderbilt has breached the Assignment;

C.    A judgment that Loyd has breached the Agreement;

D.    A judgment that Loyd has breached the Assignment;

E.    A judgment that Vanderbilt has breached the implied covenant of good faith and fair dealing;

F.    A judgment that Loyd has breached the implied covenant of good faith and fair dealing;

G.    A judgment that Loyd has intentionally and tortiously interfered with UTC's contractual relationship with Vanderbilt;

H.    A judgment that Vanderbilt engaged in fraud in connection with representations in the Agreement and Assignment;

I.    A judgment that Loyd engaged in fraud in connection with representations in the Agreement and Assignment;

J.    A judgment that Vanderbilt and Loyd must each indemnify, defend, and hold UTC harmless from any and all losses resulting from or arising out of breaches of the Agreement and Assignment, including, but not limited to: any judgment in the Watson Litigation invalidating the Patents, the dismissal or denial of UTC's claims in the Watson Litigation as a result of defendants' actions, and any ability for Watson to launch its generic version of TYVASO® earlier than it would have been able to in the absence of Defendants' improper conduct;

K.     A judgment declaring that: (a) UTC possesses the exclusive rights, title and interest to the Patents; and (b) Vanderbilt and Loyd do not possess any right, title or interest to the Patents;

L.     Temporary, preliminary, permanent, or other injunctive relief as necessary or appropriate should Vanderbilt seek to avoid its obligations under the Agreement and Assignment prior to disposition of this action;

M.     Temporary, preliminary, permanent, or other injunctive relief as necessary or appropriate should Loyd seek to avoid his obligations under the Agreement and Assignment prior to disposition of this action;

N.     Temporary, preliminary, permanent, or other injunctive relief against Loyd from any further interference with Vanderbilt's and UTC's performance of their obligations under the Agreement;

O.     Damages from Defendants' conduct as may be proved to the Court;

P.     Costs and expenses in this action; and

Q.     Such further and other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff requests trial by jury for all issues so triable.

Dated: November 7, 2016                          Respectfully submitted,

William C. Jackson (D.C. Bar No. 475200)
Boies, Schiller & Flexner LLP
5301 Wisconsin Ave, NW
Washington, DC 20015
202-237-2727

Douglas Carsten
(*pro hac* application forthcoming)
Wilson Sonsini Goodrich & Rosati

12235 El Camino Real, Suite 200
San Diego, CA 92130
858-350-2305

Veronica S. Ascarrunz (D.C. Bar No. 494474)
Wilson Sonsini Goodrich & Rosati
1700 K Street, NW, Suite 500
Washington, DC 20007
202-973-8812

Shaun R. Snader (D.C. Bar No. 492231)
United Therapeutics Corp.
1735 Connecticut Avenue, Second Floor
Washington, D.C. 20009
202-483-7000

*Attorneys for Plaintiff*
*United Therapeutics Corporation*