UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
UNITED THERAPEUTICS CORPORATION,          )
                                          )
            Plaintiff,                    )
                                          )
                                          )
       v.                                 )   Civil Action No. 16-2220 (RBW)
                                          )
                                          )
VANDERBILT UNIVERSITY and                 )
DR. JAMES E. LOYD,                        )
                                          )
            Defendants.                   )
                                          )
_____)

## MEMORANDUM OPINION

This case arises from a dispute over the ownership of two patents that were cooperatively developed by the plaintiff, United Therapeutics Corporation ("United Therapeutics"), and the defendants, Vanderbilt University ("Vanderbilt") and Dr. James E. Loyd. See Complaint ("Compl.") ¶¶ 1, 3. United Therapeutics seeks damages and a declaratory judgment finding that "[Dr.] Loyd and Vanderbilt have no rights, title or interest in the [p]atents, and that [United Therapeutics] is the rightful exclusive owner by assignment of all rights, titles, and interests in the [p]atents." Id. ¶ 5. Currently before the Court is the defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof ("Defs.' Mot."), which seeks dismissal of the Complaint on the grounds that this Court lacks personal jurisdiction over the defendants, that venue in this District is improper, and that United Therapeutics has failed to state a claim upon which relief may be granted, see Defs.' Mot. at 1, as well as the defendants' Motion to Strike the Declaration of Andrew Fisher and Memorandum and Points and Authorities

in Support ("Defs.' Strike Mot."). After careful review of the parties' submissions,[1] the Court concludes that it must deny the defendants' motion to strike, but must grant their motion to dismiss.

## I. BACKGROUND

United Therapeutics is a biotechnology and pharmaceutical company that is incorporated in Delaware, headquartered in Silver Spring, Maryland, and has an office in the District of Columbia. Compl. ¶¶ 7, 12. Vanderbilt is a university located in Nashville, Tennessee, and Dr. Loyd is a professor at Vanderbilt who resides in Tennessee. Defs.' Mot. at 6; see also Compl. ¶¶ 8–9.

United Therapeutics developed a drug named treprostinil to treat pulmonary hypertension, which was originally approved "for infusion through a continuous pump." Compl. ¶ 13. In 1997, United Therapeutics approached Vanderbilt to discuss developing "an aerosolized inhalable" version of treprostinil. Id. ¶ 14. Throughout 1997, Vanderbilt's Dr. Richard Parker and Dr. Loyd communicated and collaborated with United Therapeutics employees located in North Carolina on an inhalable treprostinil pilot study. See Pl.'s Opp'n, Exhibit ("Ex.") 2 (Declaration of Andrew Fisher ("Fisher Decl.")) ¶¶ 8–12.[2] During this time period, United

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint ("Pl.'s Opp'n"); (2) the Defendants' Reply Memorandum of Points and Authorities in Support of their Motion to Dismiss (Defs.' Reply"); (3) the Plaintiff's Memorandum of Points and Authorities in Opposition to the Defendants' Motion to Strike the Declaration of Andrew Fisher ("Pl.'s Strike Opp'n"); and (4) the Defendants' Reply Memorandum in Support of Their Motion to Strike the Declaration of Andrew Fisher ("Defs.' Strike Reply").

[2] The defendants urge this Court to strike certain paragraphs of the Fisher Declaration because "Fisher qualifies his declaration by asserting that 'the matters stated herein are based upon [his] personal knowledge as well as upon information and belief.'" Defs.' Strike Mot. at 2 (quoting Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 2); Defs.' Strike Reply at 9 (clarifying that paragraphs 7–12 and 17–18 should be stricken "and not consider[ed] . . . in deciding the Defendants' Motion to Dismiss"). The defendants also argue that "[w]hether or not the Fisher Declaration and attached exhibits are considered by the Court, [United Therapeutics] has failed to meet its burden to establish personal jurisdiction over Vanderbilt and Dr. Loyd." Defs.' Strike Reply at 2. In the Court's view, this statement by
(continued . . .)

Therapeutics sent one check in the amount of $3,600.00 from the District of Columbia to Vanderbilt to cover the cost of the pilot study. See id., Ex. 2 (Fisher Decl.) ¶ 11, Ex. J (contact dated Oct. 23, 1997, from Theresa Fergo to Dr. Parker).

In May of 1998, the parties signed a Research Grant Agreement (the "Agreement"), see Compl. ¶ 17; see also Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 16 ("On May 15, 1997, Vanderbilt sent signed copies of the Agreement . . . to [United Therapeutics' District of Columbia] office, . . . [and United Therapeutics] returned the final executed copy to Vanderbilt on May 21, 1997."); Pl.'s Opp'n, Ex. 2, Ex. A (Agreement), but Vanderbilt's signatories, Dr. Parker and Thomas Barnes, did not come to the District of Columbia to negotiate or execute the Agreement, see Defs.' Mot. at 7; see also id., Ex. 4 (Declaration of Thomas F. Barnes ("Barnes Decl.")) ¶ 4; id., Ex. 5 (Declaration of Dr. Richard E. Parker ("Parker Decl.")) ¶ 4. The Agreement designates that it is governed by Tennessee law, Pl.'s Opp'n, Ex. 2 (Fisher Decl.), Ex. A (Agreement) § 11(g), and the defendants performed their research in Nashville, Tennessee, while collaborating with Dr. Cloutier, Dr. Crow, and Dr. Wade, who were located in North Carolina, see Defs.' Mot., Ex. 2 (Declaration of Dr. James E. Loyd ("Loyd Decl.")) ¶ 5.

Following the development of the inhalable version of treprostinil, the parties' collaborative work was sent to United Therapeutics' patent attorney Stephen Maebius, at the

---

( . . . continued)
the defendants amounts to a concession that the Court need not resolve their motion to strike because, even if the Court were to deny the motion and consider the Fisher Declaration in its entirety, the Court still would not have personal jurisdiction over the defendants. See id. In any event, the Court agrees with United Therapeutics that it can infer that Fisher had personal knowledge of the information contained in the paragraphs at issue because he made those statements based on his review of United Therapeutics' business records, as well as on his "firsthand knowledge of the related facts garnered from [his] current and prior roles at [United Therapeutics]," Pl.'s Strike Opp'n, Ex. 1 (Supplemental Declaration of Andrew Fisher ("Fisher Supp. Decl.")) ¶ 7, and "[p]ersonal knowledge may be inferred from the affidavit itself, by considering the affiant's position and job responsibilities," Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 93 F. Supp. 2d 1, 11 (D.D.C. 2000); see also Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a prima facie showing.' Moreover, to establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court."). Therefore, the Court will deny the motion to strike.

3

District of Columbia office of the law firm Foley & Lardner, LLP ("Foley & Lardner"). Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 19; see also id., Ex. 2 (Fisher Decl.), Ex. E (Notice of Recordation of U.S. Patent Addressed to Maebius at Foley & Lardner); id., Ex. 2 (Fisher Decl.), Ex. O (patent application sent on Foley & Lardner letterhead). After the patents were granted, Drs. Parker, Loyd, Crow, Wade, and Cloutier assigned their ownership rights to United Therapeutics. See id., Ex. 2 (Fisher Decl.), Ex. E (Assignment). Neither Dr. Loyd nor Dr. Parker traveled to the District to negotiate or execute the Assignment. See Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 21 ("[United Therapeutics] sent a draft of the Assignment to Dr. Loyd for his signature."); see also Defs.' Mot., Ex. 2 (Loyd Decl.) ¶ 9 ("I never travelled to Washington, D.C. concerning any negotiation of or the execution of the Assignment. I signed the Assignment in Nashville, Tennessee."); id., Ex. 5 (Parker Decl.) ¶ 6 ("To my recollection, I never travelled to Washington, D.C. for any discussion of or the execution of the Assignment. As I recall, I signed the Assignment in Nashville, Tennessee."). The parties' submissions do not reveal any further contact between the parties until United Therapeutics contacted Vanderbilt and Dr. Loyd in 2016, to compel them to assist United Therapeutics in its patent infringement suit against a third party. See Compl. ¶¶ 22–27. In response, the defendants asserted their own ownership rights to the patents. See id. ¶¶ 4, 6.

## II. STANDARD OF REVIEW

When a defendant moves to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant. Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990); see also First Chicago Int'l v. United Exchange Co., 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("[The] plaintiff must make a prima facie showing of the

4

pertinent jurisdictional facts." (citations omitted)). Conclusory statements do not satisfy this burden. See GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d 1343, 1349 (D.C. Cir. 2000) (citing First Chicago Int'l, 836 F.2d at 1378–79). Instead, the plaintiff must allege specific facts connecting the defendant to the forum. See, e.g., Second Amendment Found. v. U.S. Conference of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2001). Because the court is permitted to "consider material outside of the pleadings in ruling on a motion to dismiss for lack of . . . personal jurisdiction," Artis v. Greenspan, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) (citing Land v. Dollar, 330 U.S. 731, 735 n.4 (1947)), those allegations may be "bolstered by . . . affidavits and other written materials as [the plaintiff] can otherwise obtain," Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005). And although the court need not accept the plaintiff's allegations bearing upon personal jurisdiction as true, see Associated Producers, LTD v. Vanderbilt Univ., 76 F. Supp. 3d 154, 161 (D.D.C. 2014), "factual discrepancies appearing in the record must be resolved in favor of the plaintiff," Crane, 894 F.2d at 456 (citation omitted).

## III. ANALYSIS

### A. The Defendants' Transaction of Business in the District

Under the District of Columbia long-arm statute, a court "may exercise personal jurisdiction over a person . . . [when] a claim for relief aris[es] from the . . . [non-resident defendant's] . . . transacting . . . [of] business in the District of Columbia." D.C. Code § 13-423(a)(1) (2001). The District of Columbia Circuit has interpreted this provision of the long-arm statute "to provide jurisdiction to the full extent allowed by the Due Process Clause" of the United States Constitution, and so "the statutory and constitutional jurisdictional questions . . . merge into a single inquiry"; that is, whether the court's exercise of jurisdiction over the non-resident defendant satisfies "the demands of due process." Thompson Hine, LLP v.

Taieb, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quoting United States v. Ferrara, 54 F.3d 825, 828 (D.C. Cir. 1995)). Jurisdiction over a non-resident defendant will satisfy due process if

> there are "minimum contacts" between the [non-resident] defendant and the forum, "such that he should reasonably anticipate being haled into court there." Such minimum contacts must show that [this] defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

Thompson Hine, 734 F.3d at 1189 (first quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); then quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); and then quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

Three cases guide the Court's analysis of whether the defendants' had contacts with the District of Columbia that provide an adequate basis for this Court to exercise personal jurisdiction over them. First, the Supreme Court in Burger King v. Rudzewicz determined that a Florida long-arm statute permitted a federal district court in Florida to exercise personal jurisdiction over the defendant, a Michigan resident, in a breach of franchise agreement case. See 471 U.S. 462, 463–64 (1985). In that case, the defendant had initiated contact with Burger King's Miami headquarters to discuss operating a Burger King franchise in Michigan. See id. at 467. The defendant negotiated the franchise agreement with Burger King's Miami office and obtained "limited concessions from the Miami headquarters." Id. The franchise agreement provided that (1) it would remain in effect for twenty years; (2) Florida law would govern the relationship between the parties; (3) fees would be paid by the defendant to Burger King's Miami office; (4) the defendant would abide by Burger King's standards in service, appearance, and quality of product; (5) Burger King would provide advertising assistance, cost-control, and ongoing training in accounting and restaurant management, and would "set[] policy and work directly with its franchisees . . . to resolve major problems"; and (6) the defendant was personally

obligated to Burger King during the twenty-year term of the franchise agreement. Id. at 464–467. After the defendant ceased paying his monthly fees, Burger King officials in the Miami headquarters "engaged in prolonged but ultimately unsuccessful negotiations with [the defendant]" before terminating the franchise agreement and bringing suit. Id. at 468.

The Supreme Court concluded that the Florida district court properly exercised personal jurisdiction over the defendant due to several factors. See id. at 478. First, the Supreme Court noted that the defendant "deliberately reach[ed] out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise." Id. at 479–80 (internal quotation marks omitted); see also id. at 473 ("[P]arties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities."). Because of these negotiations and the defendant's prior negotiations with the Miami headquarters before he signed the franchise agreement, the Supreme Court found that Burger King's Miami headquarters and the defendant "carried on a continuous course of direct communications by mail and by telephone, and it was the Miami headquarters that made the key negotiating decisions out of which the instant litigation arose." Id. at 481. Second, the franchise agreement, which was "carefully structured," established a long-term relationship between the defendant and a Florida corporation, and Burger King exercised "exacting regulation of virtually every aspect of [the defendant's] operations." Id. at 465, 480. Finally, the Florida choice of law clause in the agreement—although not in itself dispositive— "reinforced [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Id. at 482 ("[N]othing in our cases . . . suggests that a choice-of-law provision should be ignored in

7

considering whether a defendant has purposefully invoked the benefits and protections of a State's laws." (internal quotation marks omitted)).

In Thompson Hine, a Florida resident signed a retainer agreement with an Ohio-based law firm that had an office in the District of Columbia, for the firm to provide services in a matter in Oregon. See 734 F.3d at 1188, 1191. This Circuit concluded that the engagement of the law firm fell "short of establishing the requisite 'minimum contacts' with the District [of Columbia]," id. at 1192, notwithstanding the fact that the firm had "performed work for [the Florida resident] in the District [of Columbia]," id. at 1194. In reaching this conclusion, the Circuit found that: (1) the retainer agreement was "signed outside the District [of Columbia]" and only "pertain[ed] to a matter in Oregon"; (2) "nothing in the retainer [agreement] . . . require[d] that the firm perform work or receive payment in the District [of Columbia]"; (3) there was "no evidence of any meetings, phone calls, or emails between [the Florida resident] and the firm's D.C.-based lawyers concerning the Oregon matter"; (4) the retainer agreement contained no choice-of law provision; and (5) the retainer agreement was short-lived, i.e., it "lasted at most seven months." Id. at 1192. The Circuit explained that "[t]he mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within this jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws." Id. at 1194 (quoting Mouzavires v. Baxter, 434 A.2d 988, 1002 (D.C. 1981)); see also id. ("A non-resident's mere retention of a D.C.-based service provider, absent any other deliberate contact with the forum—demonstrated either by the terms of the contract itself or by the non-resident's actual dealings with the District—cannot qualify as a 'minimum contact.'").

Similarly, in Health Communications, Inc. v. Mariner Corp., this Circuit also concluded that a non-resident lacked sufficient contacts with the District of Columbia for the proper exercise of personal jurisdiction. 860 F.2d 460, 465 (D.C. Cir. 1988). There, a District of Columbia corporation was retained by a Texas corporation so that the District-based corporation could provide certain training to employees of the Texas-based corporation. Id. at 461. "The [applicable] contract was signed in Texas" and "it did not make any provision concerning either . . . parties' choice of law." Id. "In performance of this contract, and a further agreement to like effect, [the District-based corporation] held four two-day workshop sessions 'at various locations throughout the United States,' none of them in the District," where employees of the Texas-based corporation "took an examination that [the District-based corporation] graded at its office in the District . . . ." Id. Subsequently, the District-based corporation "issued certificates to those who had passed," and "also sent . . . periodic reports listing all . . . employees who had received . . . training," as well as "a quarterly newsletter and other communications, all originating from the District . . . ." Id. The Circuit explained that these contacts between the parties only reflected a "narrowly specialized" relationship, where the District-based corporation "exercise[d] indirect control" over the Texas-based corporation's contacts with the District. Id. at 463; see also id. at 464 (noting that the District-based corporation's control neither extended nor affected, "much less define[d], the character of the [Texas-based corporation]'s business"). The Circuit further explained that "a purchaser who selects an out-of-state seller's goods or services based on . . . economic merit does not thereby purposefully avail itself of the seller's state law, and does not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships merchandise." Id. at 465.

Here, both Vanderbilt and Dr. Loyd argue that the "Court lacks personal jurisdiction over [them]." Defs.' Mot. at 3. United Therapeutics contends in response that both defendants are subject to personal jurisdiction under section 13-423(a)(1) of the District of Columbia Code because they "deliberately created continuing obligations between themselves and [United Therapeutics]." Pl.'s Opp'n at 8; Compl. ¶ 11 ("Specifically, Vanderbilt and Dr. Loyd negotiated the Agreement and the Assignment in Washington, D.C."). United Therapeutics also argues that Dr. Loyd "deliberately engaged in a years-long collaborative relationship" with United Therapeutics to develop an inhalable version of treprostinil, Pl.'s Opp'n at 9, which included the execution of a pilot study funded by United Therapeutics, the negotiation and execution of the Agreement, and the execution of the Assignment, see id. at 9–11. And, United Therapeutics argues that Vanderbilt is subject to jurisdiction in the District "[f]or substantially the same reasons." Id. at 12. The Court concludes, however, that for the following reasons, United Therapeutics has failed to establish that either defendant engaged in the minimum contacts necessary to support exercising personal jurisdiction over the defendants.

Although the Court agrees with United Therapeutics that the parties "deliberately engaged in a years-long collaborative relationship," id. at 9, the vast majority of the defendants' activities resulting from that relationship occurred in Tennessee, not in the District. After United Therapeutics approached Vanderbilt regarding the development of inhalable treprostinil, see Compl. ¶ 14, the defendants, working in Tennessee, collaborated with United Therapeutics employees located in North Carolina to conduct a pilot study, see Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 10 (stating that "[p]ersonnel from [United Therapeutics] (including Dr. Gilles Cloutier . . . in North Carolina) and personnel from Vanderbilt (including Dr. Parker) maintained communication and collaborated during the pilot studies" (emphasis added)); see also id., Ex. 2

10

(Fisher Decl.), Ex. F (pilot study proposal dated Mar. 11, 1997, from Dr. Loyd to Shelmer Blackburn in North Carolina); Ex. G (facsimile ("fax") dated Nov. 14, 1997, from Dr. Cloutier in North Carolina to Dr. Parker); id., Ex. 2 (Fisher Decl.), Ex. H (fax dated Dec. 15, 1997, from Dr. Cloutier in North Carolina to Dr. Parker); id., Ex. 2 (Fisher Decl.), Ex. I (undated contact from Dr. Parker to Dr. Cloutier in North Carolina following Oct. 13, 1997 meeting), id., Ex. 2 (Fisher Decl.), Ex. K (fax dated Nov. 11, 1997, from Blackburn in North Carolina to Dr. Parker). The only event that occurred in the District that can be associated with the defendants during the pilot study is a single check mailed from United Therapeutics' District office to cover the costs of the pilot study. See Pl.'s Opp'n, Ex. 2 (Fisher Decl.), Ex. J (contact dated Oct. 23, 1997, from Theresa Fergo to Dr. Parker), and this act alone does not constitute a contact with the District on the part of the defendants, see Hanson, 357 U.S. at 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). Therefore, although there were continuous contacts between the defendants and United Therapeutics employees during the pilot study, these employees were located in North Carolina, and thus, their conduct does not demonstrate that the defendants "purposefully availed [themselves] of the benefits of conducting business in the [District]." Burger King, 471 U.S. at 488.

As the pilot study was being conducted, the parties began negotiating the Agreement. See Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 13. United Therapeutics claims that "[t]hese negotiations lasted several months, and included the exchange of several drafts between Vanderbilt and [United Therapeutics' District] office," id. at 10. In Health Communications, the parties negotiated their services contract over a period of eight months, which included "several telephone conversations and exchange[s of] correspondence," 820 F.2d at 461. The Circuit,

however, did not focus on the negotiations at all, but rather on the "narrowly specialized" relationship between the parties that resulted as a consequence of those negotiations. See id. at 463–64. Moreover, in this case, the only evidence of the defendants' contacts with the District during the negotiation of the Agreement were: (1) a fax that Dr. Parker sent to Fisher <u>upon Dr. Cloutier's request</u>, see id., Ex. 2 (Fisher Decl.), Ex. M (fax dated Feb. 17, 1998, from Dr. Parker to Andrew Fisher); and (2) a fax regarding "one minor change" in the Agreement's terminology that did "not affect the cost [that was] determined for the project," see id., Ex. 2 (Fisher Decl.), Ex. N (e-mail dated May 15, 1998, from Ward Cullum to Andrew Fisher). In the Court's view, these two isolated communications from Vanderbilt to United Therapeutics regarding their negotiation of the Agreement do not establish that the defendants "purposefully establish[ed] 'minimum contacts' in the [District of Columbia]." <u>Burger King</u>, 471 U.S. at 474.

As for the parties' course of dealing pursuant to the Agreement, the contacts between the defendants and United Therapeutics are similar to the contacts identified in <u>Thompson Hine</u>, 734 F.3d at 1192. In that case, the Circuit noted that the retainer agreement was not signed in the District and "pertain[ed] to a matter in Oregon, and nothing in the retainer itself require[d] that the firm perform work or receive payment in the District." <u>Id.</u> at 1192. Further, "[the attorney] supervised the Oregon matter from Atlanta . . .[, and] the record contain[ed] no evidence of any [contact] between [the majority owner, president, and CEO of the corporation that retained the firm] and the firm's D.C.-based lawyers concerning the Oregon matter." <u>Id.</u> Here, the Agreement contemplated that Vanderbilt and United Therapeutics would establish a Managing Committee "to facilitate their cooperative drug discovery effort," Pl.'s Opp'n at 3, <u>see also</u> <u>id.</u>, Ex. 2 (Fisher Decl.), Ex. A (Agreement) § 3(a)(2), but the United Therapeutics representative on that Committee was Dr. Cloutier, see id., Ex. 2 (Fisher Decl.), Ex. A (Agreement) § 4(a), who, as

noted earlier, was based in North Carolina, see Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 10. Thus, like the situation in Thompson Hine, there is no evidence of any meaningful contact between the defendants and United Therapeutics employees in the District concerning the research performed pursuant to the Agreement.

Finally, the Court notes that the Agreement designates that it is governed by Tennessee law. Pl.'s Opp'n, Ex. 2 (Fisher Decl.), Ex. A (Agreement) § 11(g). Although choice-of-law clauses are not dispositive, they "reinforce[] . . . [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Burger King, 471 U.S. at 482; see also id., 471 U.S. at 479 ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."). Therefore, the Court concludes that the research contemplated by the Agreement would be performed by the defendants in Tennessee, see Defs.' Mot., Ex. 2 (Loyd Decl.) ¶¶ 5–6, and collaboration on the research was conducted with United Therapeutics employees located in North Carolina, see Pl.'s Opp'n, Ex. 2 (Fisher Decl.) ¶ 17. Based on this record, the Court "cannot say that [the defendants] avail[ed] [them]selves of the privilege of conducting activities within the [District]." Thompson Hine, 734 F.3d at 1192 (quoting Health Comm'ns, 860 F.2d at 464).[3]

---

[3] United Therapeutics urges this Court to follow the reasoning in Ironbound Partners LLC v. Source Interlink Companies, Inc., No. 05-1039JGP, 2005 WL 3274575 (D.D.C. Aug. 26, 2005). See Pl.'s Opp'n at 12. The Ironbound decision, which entirely overlooked the Health Communications decision, see generally Ironbound Partners, 2005 WL 3274575, stated that "[t]he requirement that the defendant transacted business in the District can be met by 'those contractual activities of a nonresident defendant which cause a consequence [in the District]," id. at *2 (second alteration in original) (quoting Sheikh v. Mr. K.'s Restaurant, Inc., 2005 WL 1387591, at *3). That proposition is derived from a District of Columbia Court of Appeals case. See Mouzavires, 434 A.2d at 992. The District of Columbia Circuit expressly declined to follow Mouzavires in Thompson Hine. See Thompson Hine, 734 F.3d at 1193 ("But in exercising jurisdiction over defendants with such limited relationships to the District, [Mouzavires and two other District of Columbia Court of Appeals] cases—or at least Thompson Hine's characterization of them—appear to have adopted the very kind of 'mechanical test' that Burger King expressly rejected."). Instead, the Circuit found merit in the Mouzavires dissent. See id. Because the Circuit rejected the Mouzavires rationale relied upon in Ironbound, this Court cannot follow that decision.

13

Finally, United Therapeutics points to Dr. Loyd's execution of the Assignment as evidence of the defendants' collaboration with United Therapeutics on the patent applications. See Pl.'s Opp'n at 11. In the Court's view, the Assignment presents an even more limited relationship between the parties than the Agreement. Both parties agree that Dr. Loyd executed the Assignment "[p]ursuant to the terms of the Agreement," Pl.'s Opp'n at 4, see also Defs.' Reply at 4 ("[T]he [A]ssignment arose out of a prior business relationship between [United Therapeutics] and Vanderbilt under the [Agreement], not some separate relationship with Dr. Loyd."), and Dr. Loyd executed the Assignment in Tennessee without any negotiation, see Defs.' Mot., Ex. 2 (Loyd Decl.) ¶¶ 8–9. The Assignment did not create a continuing relationship or financial obligations between the parties; rather, it only required Dr. Loyd to "do all acts reasonably serving to ensure that the said inventions, patent applications and Letters Patent shall be held and enjoyed by said Assignee." See Pl.'s Opp'n, Ex. 2 (Fisher Decl.), Ex. E (Assignment) at 4. And United Therapeutics identifies no other evidence documenting the defendants' "collaborat[ion with United Therapeutics] to protect certain inventions developed under the collaborative drug investigation." Pl.'s Opp'n at 11. Therefore, the Court concludes that United Therapeutics has failed to carry its burden of establishing that this Court can exercise personal jurisdiction over the defendants under section 13-423(a)(1) of the District of Columbia Code.

**B.     Vanderbilt's Alleged Conduct in the District**

United Therapeutics also argues that Vanderbilt is subject to jurisdiction under section 13-423(a)(4) of the District of Columbia Code, see Pl.'s Opp'n at 13, as a result of

> causing tortious injury in the District of Columbia by an act or omission outside of the District of Columbia if [it] regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia,

14

D.C. Code § 13-423(a)(4). Although section 13-423(a)(1) of the District of Columbia Code "has been interpreted to be coextensive with the Constitution's due process requirements," section 13-423(a)(4) "has been construed more narrowly." GTE Media Servs., 199 F.3d at 1347

Offices established in the District to lobby the federal government do not constitute a "persistent course of conduct" under section 13-432(a)(4). See Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc., 355 A.2d 808, 813 (D.C. 1973) ("Entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction"). This doctrine, known as the "government contacts" doctrine, arose from the need to have "unfettered access to federal departments and agencies," id., and is grounded in First Amendment principles, see Companhia Brasileira Carbureto De Calicio v. Applied Indus. Metals Corp., 35 A.3d 1127, 1131 (D.C. 2012) (noting that "some of the [its] decisions may have implicitly narrowed the scope of the government contacts doctrine by concluding that 'the First Amendment provides the only principled basis' supporting it"). Permitting District of Columbia courts to exercise jurisdiction over defendants present in the District solely to advocate before the federal government would "threaten to convert the District of Columbia into a national judicial forum." Envtl. Research Int'l, 355 A.2d at 813; see also Naartex Consulting Corp. v. Watt, 722 F.2d 779, 786–87 (D.C. Cir. 1983) (concluding that the defendants' appearances in the District "undoubtedly qualify as exercises in petitioning the government" and therefore "qualify for exemption" under the government contracts doctrine). Therefore, maintaining an office in the District for the primary purpose of petitioning the federal government generally falls within the reach of the government contacts doctrine. See Envtl. Research Int'l, 355 A.2d at 813; see also Inv. Co. Inst. v. United States, 550 F. Supp. 1213, 1217–18 (D.D.C. 1982) (holding that a Massachusetts' bank's "continuing

15

relationships" with "governmental or quasi-governmental entities" that constitute "integral parts of the nation's mortgage banking system" fell within the parameters of the government contacts doctrine, and thus were insufficient to establish personal jurisdiction).

United Therapeutics asserts that Vanderbilt is subject to jurisdiction in the District pursuant to section 13-423(a)(4) because Vanderbilt "maintains a substantial presence within this District through its Office of Federal Relations." Pl.'s Opp'n at 13. United Therapeutics contends that the government contacts exception does not apply to the Office of Federal Relations because, in addition to contacting the federal government, the Office "'works with a wide range of non-governmental organizations, holds educational seminars, and hosts internships and other programs for students [in the District]." Id. (quoting id., Ex. 1 (Declaration of Eric Arnell "Arnell Decl."), Ex. 3 (Office of Federal Relations: Vanderbilt's Role in Washington ("Vanderbilt's Role")). The Court disagrees.

Vanderbilt's Office of Federal Relations "concerns itself with federal legislation, regulations, and policies that could affect the University." Defs.' Mot. at 6. In addition to "advocat[ing] on behalf of federal legislation, regulations and policy that could affect Vanderbilt University," Pl.'s Opp'n, Ex. 1 (Arnell Decl.), Ex. 2 (About), conduct that fits squarely within the government contracts doctrine, see Associated Producers, 76 F. Supp. 3d at 167 n.2 (rejecting the plaintiffs' argument that "Vanderbilt's contacts with the District through its Office of Federal Relations, which advocates for federal legislation, regulations, and policy," falls outside the scope of the government contacts doctrine), the Office of Federal Relations "works closely with many higher education associations and coalitions headquartered in Washington, D.C., and in tandem with other Tennessee colleges and universities," Pl.'s Opp'n, Ex. 1 (Arnell Decl.), Ex. 2 (About). Because the Office of Federal Relations makes clear by stating on its website that the

16

purpose of this collaboration is to advance its policy agenda, see id., Ex. 1 (Arnell Decl.), ex. 3 (Vanderbilt's Role) ("We make officials aware of Vanderbilt's expertise in key areas of concern and, whenever appropriate, advocate positions that advance the interests of Vanderbilt and the broader higher education community. We often work in tandem with other research universities and play a leadership role in numerous national associations and coalitions that address these issues."), the Office's work with other non-governmental organizations falls within the scope of the government contacts doctrine, cf. Inv. Co. Inst., 550 F. Supp. at 1217 n.6 (noting that it would surprise members of "the many trade associations having offices here that their memberships counted as intrastate business for jurisdictional purposes").

The Office of Federal Relations also hosts a two-day Federal Science, Technology, Engineering, and Mathematics ("STEM") Policy and Advocacy seminar in the District for Vanderbilt "students and postdoctoral fellows interested in [STEM], including Social Sciences." Pl.'s Opp'n, Ex. 1 (Arnell Decl.), Ex. 6 (Vanderbilt's STEM Policy in Washington). The seminar provides "an opportunity to learn how Federal STEM policy is made and the role of advocacy by various stakeholders in achieving policy goals." Id., Ex. 1 (Arnell Decl.), Ex. 6 (Vanderbilt's STEM Policy in Washington). Again, because the event focuses on the Office's federal policy advocacy work, it also falls squarely within the government contacts doctrine. Cf. Naartex Consulting, 722 F.2d at 786–87 (holding that the government contacts exception applied to a non-resident defendant who operated an office in the District for the purpose of "monitor[ing] legislative and regulatory matters and maintain[ing] official contacts with the Congress and the executive branch"); Sierra Club v. Tenn. Valley Auth., 905 F. Supp. 2d 356, 363 (D.D.C. 2012) (concluding that the government contacts exception "prevent[ed] th[e] Court from finding personal jurisdiction" over a defendant on the basis of its District of Columbia

17

office, which had "a staff of four that obtain[ed] information concerning matters affecting [the defendant], circulate[d] information about [the defendant] to Federal Government officials and the public, and arrange[d] meetings between [the defendant's] officers and officials of other Federal Government agencies").

Finally, the Office of Federal Relations runs an unpaid summer internship program for Vanderbilt students who "have ties to Tennessee and are interested in higher education and science public policy issues." Pl.'s Opp'n, Ex. 1 (Declaration of Eric Arnell ("Arnell Decl.")), Ex. 4 (Internships). Once again, because the focus of the Office of Federal Relations' internship program concerns federal public policy, the fact that students participate in the program does not exclude the educational opportunity provided to them from the government contracts doctrine.[4] Cf. Naartex Consulting, 722 F.2d at 786–87; Sierra Club, 905 F. Supp. 2d at 363.

### IV. CONCLUSION

For all of the foregoing reasons, United Therapeutics has failed to demonstrate that the defendants' engaged in sufficient minimum contacts with the District to support this Court having personal jurisdiction pursuant to section 13-423(a)(1) of the District of Columbia Code. Nor has United Therapeutics established that Vanderbilt's Office of Federal Relations engages in a "persistent course of conduct" in the District sufficient to warrant this Court exercising

---

[4] United Therapeutics also submitted an exhibit regarding the Vanderbilt Internship Experience in Washington Program (the "VIEW program"). See Pl.'s Opp'n, Ex. 1 (Arnell Decl.), Ex. 5 (VIEW Program). This program, however, is not operated by the Office of Federal Relations, see id., Ex. 1 (Arnell Decl.), Ex. 5 (VIEW Program) at 2 (stating that the program is "facilitated by the Office of Active Citizenship and Service, in partnership with the Vanderbilt University Career Center"), and thus cannot support United Therapeutics' argument that Vanderbilt "maintains a substantial presence within this District through its Office of Federal Relations," Pl.'s Opp'n at 13 (emphasis added). In any event, the existence of Vanderbilt's VIEW program is not proof that Vanderbilt "engages in [a] persistent course of conduct" in the District, see D.C. Code § 13-423(a)(4), because the Office of Active Citizenship and Service is located in Nashville, not in the District, see Pl.'s Opp'n, Ex. 1 (Arnell Decl.), Ex. 5 (VIEW Program) at 6.

personal jurisdiction over the defendants under section 13-423(a)(4). Therefore, the Court must grant the defendants' motion to dismiss.[5]

**SO ORDERED** this 15th day of August, 2017.[6]

REGGIE B. WALTON<br>United States District Judge

---

[5] Because the Court concludes that it lacks personal jurisdiction over both defendants, it need not reach their alternative arguments for dismissal under Rule 12(b)(3) or 12(b)(6).

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.